## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TANYA JACOBS,** | : | **CIVIL ACTION NO. 1:12-CV-0288** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **YORK UNION RESCUE** | : | |
| **MISSION, INC., d/b/a YORK** | : | |
| **RESCUE MISSION** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Presently before the court in the above-captioned matter is the motion (Doc. 33) for summary judgment filed by York Union Rescue Mission, Inc. ("Mission"). Mission seeks summary judgment with respect to all claims asserted by Tanya Jacobs ("Jacobs"), a former employee, who alleges that Mission discriminated and retaliated against her in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. §§ 951–963.  For the reasons that follow, the court will grant in part and deny in part Mission's motion (Doc. 33) for summary judgment.

### I.  **Factual Background & Procedural History[1]**

From 2005 through April 2010, Jacobs was an employee of Mission.  (Doc. 35 ¶¶ 2-4; Doc. 40 ¶¶ 2-4 at 19).  Mission is a nonprofit organization that provides

---

[1] To the extent facts are undisputed or supported by uncontroverted record evidence, the court cites directly to the parties' statements of material facts.

rehabilitative support to homeless men and women.  (See Doc. 39-32, Gorog Dep. 8:9-8:18, Feb. 12, 2014 ("Gorog Dep.")).  On average, Mission employs between forty-five and forty-seven employees.  (Doc. 35 ¶ 122; Doc. 40 ¶ 122 at 37).  Jacobs worked as a cashier and stocker in Mission's economy store, which resells donated items such as furniture, clothing, and kitchenware.  (Doc. 35 ¶ 5; Doc. 40 ¶ 5 at 19; Gorog Dep. 9:9-9:13).  Her responsibilities included running the cash register, "stocking the shelves, sorting [and] pricing items, cleaning[,] and assisting customers."  (Doc. 40 ¶ 20 at 2; Doc. 39-7 at 1-2 (job description)).  During Jacobs's employment, Manager Darrell Williams ("Williams") and Assistant Manager Timothy Miller ("Miller") supervised the employees at the economy store.  (Doc. 35 ¶ 12; Doc. 40 ¶ 12 at 20).  Executive Director Paul Gorog ("Gorog") oversaw the staff at Mission and was responsible for making all major employment decisions.  (Doc. 35 ¶¶ 9, 109, 115; Doc. 40 ¶¶ 9, 109, 115 at 19, 36; Gorog Dep. 10:13-10:24).

In June 2006, Jacobs transitioned from part-time employment to full-time employment.  (Doc. 35 ¶ 2; Doc. 40 ¶ 2 at 19).  As a part of the application process, she interviewed with Gorog.  (Doc. 35 ¶ 2; Doc. 40 ¶ 2 at 19).  Jacobs listed migraines as her only health problem on her job application, and during the interview, Jacobs explained that her migraines are sometimes so severe that she is unable to see or function.  (Doc. 35 ¶¶ 10-11; Doc. 40 ¶¶ 10-11 at 19).  Gorog responded by instructing her to "call in when she was unable to come in to work because of her migraines."  (Doc. 35 ¶ 13; Doc. 40 ¶ 13 at 20).

Jacobs, presently forty-nine years old, has suffered from migraines "since she was in her teens."  (Doc. 35 ¶¶ 1, 17; Doc. 40 ¶¶ 1, 17 at 19-20).  She received medical

care for her migraines from Dr. Stacy G. Robert ("Dr. Robert") of Thomas M. Hart Family Practice from February 2002 through November 2013.  (Doc. 35 ¶¶ 20-22; Doc. 40 ¶¶ 20-22 at 20).  Jacobs continues to experience migraines, and she has sought medical treatment as a result on one occasion since November 2013.  (Doc. 35 ¶ 22; Doc. 40 ¶ 22 at 20).  When she experiences a migraine, Jacobs "feels like someone is squeezing [her] head," and sometimes she "cannot see at all."  (Doc. 39-3, Jacobs Dep. 51:5-51:9, Feb. 25, 2014 ("Jacobs Dep.")).  She avers that her migraines limit her ability to "see, think, concentrate, focus, function, sleep, clean, vacuum, shop, take care of her children, work[,] and be exposed to light or noise."  (Doc. 40 ¶ 23 at 20).  Over the course of approximately twenty-five years, Jacobs's primary medication for the treatment of migraines has been Excedrin Migraine, although her doctors have prescribed medications at various points, such as "Zomig, Amitriptyline, . . . and Ibuprofen."  (Doc. 35 ¶ 88; Doc. 40 ¶ 88 at 33; Doc. 39-10 at 259, 263 (Thomas M. Hart Family Practice medical records)).  During Jacobs's employment with Mission, Dr. Robert declined to place Jacobs on "any restrictions of any kind" as a result of her migraines.  (Doc. 35 ¶ 23; Doc. 40 ¶ 23 at 20).

When Jacobs was unable to come to work because of a migraine, she would call the economy store to inform Williams or Miller.  (Doc. 35 ¶ 24; Doc. 40 ¶ 24 at 20).  Jacobs saw Dr. Robert in April 2007 for a "severe headache," (Doc. 35 ¶ 89; Doc. 40 ¶ 89 at 33); in March 2009 for a migraine, (Doc. 35 ¶ 89; Doc. 40 ¶ 89 at 33); in August 2009 for an appointment for her son, wherein Dr. Robert noted that Jacobs suffered from a migraine, (Doc. 40 ¶ 90 at 33; Doc. 39-24 (Aug. 26, 2009 medical assessment)); in November 2009 for "influenza-like illness," wherein Jacobs's active

conditions included a "migraine headache," (Doc. 35 ¶ 92; Doc. 40 ¶ 92 at 34; Doc. 33-17 at 4 (Nov. 18, 2009 medical assessment)); and in September 2010 for a migraine, (Doc. 35 ¶ 92; Doc. 40 ¶ 92 at 34).  Jacobs asserts that she "also obtained treatment for her migraine condition [between 2007 and 2009] . . . with a nurse practitioner who gave her nerve block shots."  (Doc. 40 ¶ 89 at 33; see Jacobs Dep. 210:6-211:17).  In March 2009, Jacobs told Dr. Robert that "she was not incapacitated" by her migraines and that she was "able to work with the headaches."  (Doc. 35 ¶ 90; Doc. 40 ¶ 90 at 33).

On July 19, 2009, Jacobs sustained right hand injuries as a result of a car accident.  (Doc. 35 ¶¶ 27-28; Doc. 40 ¶¶ 27-28 at 20).  Accordingly, Jacobs's physicians imposed a ten-pound lifting restriction on her right hand—her non-dominant hand—which remained in place through April 2010.  (Doc. 35 ¶¶ 30, 36; Doc. 40 ¶¶ 30, 36 at 20, 21).  After visiting the hospital, Jacobs returned to work, informing Williams and Miller that she would require light duty assignments for an undetermined period.  (Doc. 40 ¶¶ 60-61 at 34; Doc. 39-28, Williams Dep. 58:12-60:21, Feb. 12, 2014 ("Williams Dep."); Doc. 39-30, Miller Dep. 21:1-21:7, Feb. 12, 2014 ("Miller Dep.")).  Jacobs asserts that Williams responded by telling her "not to baby [her] right hand because no one [was] going to help [her]."  (Jacobs Dep. 92:8-92:23).

From July 2009 through September 2009, Jacobs managed the pain in her right arm by taking Aleve and Tylenol.  (Doc. 35 ¶ 61; Doc. 40 ¶ 61 at 28).  Jacobs's treating physicians at Orthopaedic and Spine Specialists, PC ("OSS") placed her on partial disability between August 6, 2009 and August 28, 2009.  (Doc. 40 ¶¶ 63, 65-66 at 6; Doc. 39-22 (Aug. 5, 2009 OSS work status report)).  During this period, she was

4

fully restricted from using her right hand.  (Id.)  She attended at least fourteen therapy sessions at OSS before her discharge on September 14, 2009.  (Doc. 39-27 at 17-18 (Sept. 14, 2009 OSS discharge summary)).  On that date, Jacobs identified her pain, on a scale of 0 to 10, as ranging between 0 and 7.  (Id. at 17).  She described her right hand as "achy," and her physician observed that "[m]oving and work activities may be exacerbating the pain from the initial car injury."  (Id.)

Between October 2009 and April 2010, Jacobs received treatment for her right hand impairment from Dr. Craig A. Sullivan ("Dr. Sullivan") of the Orthopedic Surgery Institute, Inc.  (Doc. 35 ¶ 38; Doc. 40 ¶ 38 at 22).  On November 25, 2009, Dr. Sullivan performed diagnostic exams and observed that Jacobs was experiencing "intermittent discomfort [and] . . . tingling in her hand."  (Doc. 39-11 at 14 (Nov. 25, 2009 medical assessment)).  On December 16, 2009, Dr. Sullivan issued Jacobs a splint and prescription medication and diagnosed her with carpal tunnel syndrome, noting: "She reports persisting discomfort minimally improved with treatment measures to date.  The pain is worse with activity.  She has frequent nighttime awakening.  There has been numbness and tingling."  (Id. at 13 (Dec. 16, 2009 medical assessment)).  Jacobs's condition did not improve; she described "pain with burning, numbness[,] and tingling" at her January 13, 2010 appointment with Dr. Sullivan.  (Id. at 12 (Jan. 13, 2010 medical assessment)).  Therein, the decision was made that Dr. Sullivan would perform carpal tunnel release surgery on Jacobs's right hand.  (Id.)

Jacobs began an approved medical leave of absence on February 2, 2010, the date of her operation.  (Doc. 35 ¶¶ 70, 116; Doc. 40 ¶¶ 70, 116 at 30, 36).  Following the

surgery, she "kept [Williams] informed about her medical condition, recovery, and anticipated return to work." (Doc. 40 ¶ 72 at 30; <u>see</u> Jacobs Dep. 153:11-153:20; Williams Dep. 85:6-86:4). On March 17, 2010, Dr. Sullivan provided Jacobs with a note approving her to return to work on April 2, 2010. (Doc. 35 ¶ 74; Doc. 40 ¶ 74 at 30). Jacobs brought Dr. Sullivan's note to the economy store on or about March 23, 2010. (Doc. 35 ¶ 75; Doc. 40 ¶ 75 at 31). After Williams received the note, he advised Jacobs that Mission was "doing evaluations on everybody in the store, and [that] they had to be done that week." (Doc. 35 ¶ 76; Doc. 40 ¶ 76 at 31).

Jacobs met with Williams and Gorog on the same day. (Doc. 35 ¶ 77; Doc. 40 ¶ 77 at 31). Gorog informed Jacobs at the outset of the meeting that her employment with Mission was being terminated, effective April 3, 2010. (Doc. 35 ¶ 78; Doc. 40 ¶ 78 at 31). Specifically, Gorog stated, "[Y]our absenteeism is a minus here because we need employees, and you are not here as much as we would like to see you here." (Gorog Dep. 48:22-49:6; <u>see</u> Doc. 35 ¶ 81; Doc. 40 ¶ 78 at 31). According to Jacobs, Gorog explained that her "performance and productivity were low because she was taking off so much time." (Doc. 40 ¶ 78 at 31; Jacobs Dep. 178:18-178:24). Gorog also expressed dissatisfaction with Jacobs's cell phone use during work hours and concerns regarding allegations of an inappropriate relationship between Jacobs and a male participant in the rehabilitation program. (Doc. 35 ¶¶ 83-84; Doc. 40 ¶¶ 83-84 at 32). Williams gave Dr. Sullivan's note to Gorog during the meeting, sometime after Gorog announced Jacobs's discharge. (Doc. 35 ¶¶ 79-80; Doc. 40 ¶¶ 79-80 at 31).

6

Mission's termination letter, dated March 17, 2010 and signed by both Gorog and Williams, provided the following reasons for her discharge:

1. Board of Directors advised Rev. Paul Gorog to lessen the amount of staff;
2. [Jacobs's] work performance was between 40-50%, and low productivity;
3. The Mission had a complaint that [Jacobs] was performing counseling on Program Man while on work duty at the store;
4. [Jacobs] had excessive use on her cell phone; and
5. [Jacobs] had an excessive amount of time off of work due to sick and non-paid days.

(Doc. 35 ¶ 107; Doc. 40 ¶ 107 at 35; Williams Dep. 90:11-90:13).  Mission's Board of Directors had informed Gorog in the fall of 2009 that the economy store was "in the red" by $40,000 to $50,000 and that Gorog "needed to reduce staff."  (Doc. 35 ¶ 112; Doc. 40 ¶ 112 at 36).  Consequently, in or around February 2010, Williams and Gorog created an employee performance evaluation system to identify candidates for termination.  (Williams Dep. 91:16-92:8).

The evaluation system comprised the following criteria: quality of work, volume of work, attendance record for the previous year, cooperation, and prior discipline.  (Doc. 40 ¶ 152 at 13; Williams Dep. 21:9-22:4).  Williams and Miller rated the economy store employees on each criterion based solely upon their "perceptions" of each individual.  (Doc. 40 ¶ 154 at 13; Williams Dep. 22:12-23:15).  They did not rely on objective "measuring tools," nor did they memorialize their observations in writing.  (Doc. 40 ¶ 155 at 13; Williams Dep. 22:17-22:20; 23:16-24:1).  Jacobs received a rating of "2" in the attendance category—indicating "needs improvement"—and an overall rating of "3."  (Doc. 40 ¶ 179 at 15; Doc. 39-17 (Jacobs

evaluation)).  Shortly after Jacobs's discharge, Mission terminated Eleanor Siple

("Siple"), also a member of the economy store staff.  (Doc. 35 ¶¶ 110-11; Doc. 40

¶¶ 110-11 at 36).  Siple received an overall rating of "2.6" on her evaluation.  (Doc.

39-20 (Siple evaluation)).  The only additional employee to receive an overall rating

as low Jacobs's was Ann Wolfrays ("Wolfrays"), a non-disabled economy store

employee who was not terminated.  (Doc. 40 ¶ 212 at 18; Doc. 39-21 (Wolfrays

evaluation)).

Gorog and Williams met twice on or around February 18, 2010 to discuss

which Mission employees should be terminated.  (Doc. 40 ¶¶ 193-94 at 17; Gorog

Dep. 103:19-104:12).  Gorog's notes from these meetings include the following

statements:

> Tanya Jacobs –
> . . .
>     8. Report on Absence – loss of time.
> . . .
> Eleanor "Ellie" Siple –
> . . .
>     6. Mental and physical condition hinders her from doing
>        her job.
> . . .
> Tim Miller –
> . . .
>     2. Tim needs to RETIRE.
>     3. Unable to move around.
>     4. Unable to do his job properly.

(Doc. 39-18 (Feb. 18, 2010 meeting notes)).  Gorog testified that although he assumed

Williams had spoken to Siple to determine whether her medical conditions were

impacting her ability to do her job, Gorog didn't "know any details."  (Gorog Dep.

109:13-109:19).  He further asserted that Siple "was drowsy, slow, . . . [and] couldn't

keep up with what she needed to be doing," possibly due to "medication from the doctor." (Id. at 109:23-110:7). Gorog also noted that Miller had previously expressed an "interest[] in retiring." (Id. at 120:18-120:24).

Jacobs denies any allegations that she attempted to counsel or start a romantic relationship with any Mission program participant. (Doc. 40 ¶ 184 at 16; Jacobs Dep. 180:6-181:18). Furthermore, Jacobs avers that her cell phone use at work was limited to emergency situations, pursuant to Mission's policy. (Doc. 40 ¶¶ 186-87; Jacobs Dep. 182:13-184:17).

In 2009, Jacobs used a total of 80 hours of vacation time, 80 hours of sick time, and 164 hours of unpaid leave. (Doc. 35 ¶ 82; Doc. 40 ¶ 80 at 32). She regularly requested time off for medical appointments and always received permission from either Miller or Williams. (Doc. 35 ¶ 53; Doc. 40 ¶ 53 at 25). Jacobs contends, however, that "throughout the last 8 months of [her] employment . . . she was subjected to repeated derogatory and discriminatory comments from Williams about her medical conditions and need for time off for same." (Doc. 39 at 10). She testified that Williams claimed to have "no light duty assignments available" after her car accident and refused to guarantee that she would receive lifting assistance during her shifts, (Doc. 39 at 10; Jacobs Dep. 83:15-83:24); that Williams warned her constantly about taking too much time off for medical reasons and questioned whether she actually needed to attend physical therapy sessions and doctor's appointments, (Doc. 39 at 10; Jacobs Dep. 67:19-68:6; 69:15-70:23; 72:13-72:18); and that Williams's "facial expressions and . . . sighs" revealed his disappointment when she requested to go on medical leave for carpal tunnel release surgery, (Doc. 39 at

11; Jacobs Dep. 151:14-151:24).  Mission responds that Jacobs was able to do her work at all times, either by using her left hand or by seeking assistance from co-workers and rehabilitation program participants, (Doc. 35 ¶ 48; Jacobs Dep. 86:11-86:23); that Williams was the only Mission employee to make comments about Jacobs's condition, (Doc. 35 ¶ 50); and that only twice did Williams tell Jacobs that she was "jeopardizing her job" by leaving work so frequently, (Doc. 35 ¶ 51). Although Jacobs asserts that she complained about Williams's mistreatment of her to Williams, Miller, and Siple, (Doc. 40 ¶ 60 at 28; Jacobs Dep. 75:2-75:7; 76:8-76:16; 77:2-77:13; 78:8-78:12; 100:4-100:22), Mission contends that Jacobs stated her objection to Williams only, (Doc. 35 ¶ 60; Jacobs Dep. 100:4-100:22).

Gorog's office was not located by the economy store.  (Doc. 35 ¶ 14; Doc. 40 ¶ 14 at 20).  As a result, Gorog was unable to personally observe Jacobs's work performance.  (Doc. 40 ¶ 30 at 3; Gorog Dep. 26:15-27:2).  Mission asserts that Gorog "did not know why [Jacobs] missed all the days she missed" in 2009 and that he formulated his opinion on her absences based solely upon bookkeeping records. (Doc. 35 ¶ 117; Gorog Dep. 50:6-50:13).  In response, Jacobs points to Gorog's testimony that in January or February of 2010, Williams informed him of the medical reasons for Jacobs's absences.  (Doc. 40 ¶ 117; Gorog Dep. 39:8-39:16; 40:8-41:1; 44:4-44:6; 45:21-45:24; 46:2-46:11).

Jacobs filed this action pursuant to the FMLA, 29 U.S.C. § 2601 *et seq.*,[2] the ADA, 42 U.S.C. § 12101 *et seq.*, and the PHRA, 43 PA. STAT. §§ 951–963.  (See Docs. 1, 19).  Specifically, Jacobs alleges that Mission discriminated against her on the basis of her disabilities and retaliated against her for requesting an accommodation and for opposing disability discrimination.  (Doc. 19 ¶¶ 39-48).  On April 3, 2014, Mission filed the instant motion (Doc. 33) for summary judgment, alleging that Jacobs has failed to proffer evidence sufficient to support any of her claims.  The motion has been fully briefed and is ripe for disposition.

## II.   Legal Standard

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See FED. R. CIV. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the

---

[2] During discovery, Mission demonstrated that it was not regulated under the FMLA during Jacobs's employment because it did not employ fifty or more employees within seventy-five miles of the economy store during that time, as required by the FMLA.  See 29 U.S.C. § 2611(2)(b)(ii).  The parties agree that Jacobs's FMLA claims must fail as a result.  (Doc. 33-16 at 2 (affidavit of Mission Office Manager); Doc. 35 ¶ 126; Doc. 39 at 2 n.1).  Accordingly, the court will grant Mission's motion for summary judgment with respect to the FMLA claims without further discussion.

non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see

also FED. R. CIV. P. 56(a), (e).  Only if this threshold is met may the cause of action

proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   Discussion

Jacobs alleges that Mission discriminated against her on the basis of her

disabilities and retaliated against her for requesting time off and for opposing

discrimination.  The court will address these claims *seriatim*.

### A.   ADA Discrimination Claim

The ADA prohibits an employer from discriminating against "a qualified

individual with a disability because of the disability . . . in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of

employment."  42 U.S.C. § 12112(a).  In 2008, the ADA Amendments Act ("ADAAA")

expanded the scope of the statute, declaring that "[t]he definition of disability . . .

shall be construed in favor of broad coverage of individuals . . . to the maximum

extent permitted by the terms of this Act."  Pub. L. No. 110–325, § 4(a), 122 Stat.

3553, 3555.  Because the events before the court occurred after January 1, 2009, the

effective date of the ADAAA, the new standard governs Jacobs's claim.  See Rocco

v. Gordon Food Serv., 998 F. Supp. 2d 422, 428 (W.D. Pa. 2014).  To state a valid

claim under the ADA, Jacobs must establish that she (1) had a disability; (2) was

qualified to perform her job, with or without reasonable accommodation; and

(3) suffered adverse employment action because of that disability.  Turner v.

Hershey Chocolate U.S., 440 F.3d 604, 611 (3d Cir. 2006).

### 1.   *Actual Disability*

As a threshold matter, Mission asserts that Jacobs's ADA claim warrants

dismissal because she "has failed to establish that her alleged disabilities, in fact,

constitute a disability under the [ADAAA]."  (Doc. 34 at 5).  Jacobs responds that

her recurring migraines and carpal tunnel syndrome place her categorically within

the protection of the amended statute.  (Doc. 39 at 14-21).

Under the ADAAA, a disabled individual:

> (A) [has] a physical or mental impairment[3] that substantially
>       limits one or more major life activities . . . ;
>
> (B) [has] a record of such an impairment; or
>
> (C) [is] regarded as having such an impairment.

42 U.S.C. § 12102(1).  A qualifying disability "need not prevent . . . or significantly or

severely restrict" a major life activity as long as the impaired individual is

substantially limited "as compared to most people in the general population."

29 C.F.R. § 1630.2(j)(1)(ii).  The statute provides a non-exhaustive list of major life

activities: "caring for oneself, performing manual tasks, seeing, hearing, eating,

sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading,

concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).

---

[3] Physical impairment is defined as "[a]ny physiological disorder or condition
. . . affecting one or more of the body systems, such as neurological,
musculoskeletal, special sense organs, respiratory (including speech organs),
cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic,
lymphatic, skin, and endocrine."  29 C.F.R. § 1630.2(h)(1).

"Ultimately, whether an individual is substantially limited as to a major life activity is a question of fact." Eastman v. Research Pharms., Inc., No. 12-2170, 2013 WL 3949236, at *8 (E.D. Pa. Aug. 1, 2013) (citing Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 759 (3d Cir. 2004)). The factfinder must accept "a degree of functional limitation that is lower than the standard . . . applied prior to the ADAAA." 29 C.F.R. § 1630.2(j)(1)(iv). The alleged disability is analyzed as of the date of the adverse employment action. See Taylor v. Phoenixville School Dist., 184 F.3d 296, 308 (3d Cir. 1999); Rocco, 998 F. Supp. 2d at 426.

### a.   Migraines

Jacobs asserts that her "testimony[,] combined with . . . medical records reflecting her migraine diagnosis and treatment[,] constitute sufficient evidence to establish that her migraine condition[] is a disability under the ADA." (Doc. 39 at 18). Specifically, Jacobs avers that her chronic migraines limit her ability to "see, think, concentrate, focus, function, sleep, clean, vacuum, shop, take care of her children, work[,] and be exposed to light or noise." (Doc. 40 ¶ 23 at 20). In her deposition, Jacobs testified that she regularly missed work at Mission due to severe migraines. (Doc. 39 at 18; Jacobs Dep. 45:5-45:19; 210:6-211:17). She endeavors to support this assertion by pointing to two types of record evidence: medical records from appointments with her treating physician and "absence reports" recorded at Mission. (Doc. 40 ¶¶ 89, 90, 92 at 33-34; Doc. 39-26 (Mission absence reports)).

In response, Mission argues that Jacobs was never placed on medical restrictions for migraines during her employment, (Doc. 34 at 13; Doc. 35 ¶ 23; Doc. 40 ¶ 23 at 20), and that Jacobs relies upon records which merely confirm the

medical nature of her visits without making reference to migraines, (Doc. 34 at 13; Doc. 39-26 (Mission absence reports)).  Consequently, Mission contends that Jacobs has failed to demonstrate that her migraine condition constitutes a disability under the ADAAA.  (Doc. 34 at 13).  The court is compelled to agree.

District courts within the Third Circuit have held that evidence of chronic pain alone does not establish a disability under the ADAAA.  See, e.g., Rocco, 998 F. Supp. 2d at 426 (holding that plaintiff who experienced knee pain but was medically cleared to work did not satisfy the ADAAA); Palish v. K & K RX Servs., L.P., No. 13-CV-4092, 2014 WL 2692489, at *8 (E.D. Pa. June 13, 2014) ("While Plaintiff correctly notes that Congress sought to relax the standard for the 'substantially limits' factor when it passed the ADAAA, he still must establish that his impairment substantially limited a major life activity beyond just merely causing pain."); cf. Butler v. BHTC Foods, Inc., No. 12-0492, 2014 WL 336649, at *7-8 (M.D. Pa. Jan. 30, 2014) (finding plaintiff's evidence of severe pain following earlier surgery and medical leave sufficient to survive summary judgment).  Furthermore, the Third Circuit has clarified that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." Gonzalez v. Sec'y of the Dep't of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012) (citing Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009)).  Self-serving deposition testimony, without more, is likewise insufficient.  See id. (finding plaintiff's "sworn statements . . . insufficient to survive summary judgment"); Irving v. Chester Water Auth., 439 Fed. App'x 125, 127 (3d Cir. 2011).

Jacobs's proffered evidence regarding the substantially limiting effects of her migraine condition does little to bolster her deposition testimony.  Upon careful review, Jacobs's medical records reveal only five migraine-related doctor's appointments over the course of approximately three years.  (Doc. 35 ¶¶ 89, 90, 92; Doc. 40 ¶¶ 89, 90, 92 at 33-34).  Two of these visits were initially scheduled for other reasons, and one took place in September 2010, months after Jacobs's termination from Mission.  (Id.)  Notably, at each appointment, Jacobs's treating physician elected not to place her on any medical restrictions.  Moreover, although Mission's absence reports list a multitude of reasons for Jacobs's time off—"illness," "doctor," "therapy," and "funeral," for example—none specifically references migraines.  (See Doc. 39-26 (Mission absence reports)).  This lack of meaningful record evidence is fatal to Jacobs's argument.  Quite simply, Jacobs's self-serving deposition testimony, supported only by documentation of five doctor's appointments which led to no restrictions, is insufficient to demonstrate that her migraines caused her to be substantially limited in a major life activity.  29 C.F.R. § 1630.2(j)(1)(ii).

### b.    Carpal Tunnel Syndrome

Jacobs next contends that her carpal tunnel syndrome qualified as a disability under the ADAAA because it substantially limited her in the major life activities of "working, sleeping, lifting, grasping, grabbing, pushing[,] and pulling." (Doc. 39 at 19).  She notes that following the car accident that caused her right hand impairment, she "was prescribed medication, placed on partial disability, given lifting restrictions, issued a splint," and ultimately compelled to take medical leave for surgery; she experienced "persistent pain, numbness, tingling[,] and . . .

frequent nighttime awakening;" and she was "prevented . . . from . . . engaging in activities which involved repetitive grasping." (Id.) In response, Mission avers that Jacobs's "assertions in her deposition as to [her] right hand condition are [not] supported . . . by the medical records;" that "she was . . . only [restricted] from lifting 10 pounds;" and that she was only medically required to miss work on one occasion, when she had carpal tunnel release surgery. (Doc. 41 at 9-10).

Prior to the ADAAA, the Third Circuit held that a plaintiff's inability to lift more than ten pounds would not render them "sufficiently different from the general population . . . [to qualify as] substantially limited in [the] ability to lift." Marinelli v. City of Erie, 216 F.3d 354, 364 (3d Cir. 2000); see also Smith v. ABF Freight Sys., Inc., No. 1:04-CV-2231, 2007 WL 3231969, at *5 (M.D. Pa. Oct. 29, 2007) (Conner, C.J.) (finding a twenty-pound lifting restriction "insufficient to constitute a substantial limitation" under the ADA). Applying the pre-ADAAA standard, the Third Circuit also observed that a "temporary non-chronic impairment of short duration is not a disability covered by the [ADA]." Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 274-75 (3d Cir. 2012) (citing Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002)) (finding that a physical impairment requiring a four-month lifting restriction was too short-term to qualify as a disability). These interpretations stand in marked contrast to the less-restrictive terms of the ADAAA.

Although the Third Circuit has not yet interpreted the boundaries of the ADAAA's protections, several district court decisions have carved out a more expansive view. The court's holding in Berkowitz v. Oppenheimer Precision Products, Inc. is illustrative. No. CIV.A.13-4917, 2014 WL 5461515, at *3-5 (E.D. Pa.

Oct. 28, 2014).  In that case, the plaintiff relied primarily on self-serving deposition testimony to establish that he was disabled as a result of "ongoing pain from a hernia, chronic back spasms, arthritis of the hands, carpal tunnel, and trigger finger."  Id. at *4.  He endeavored to reinforce his testimony with a partial record of medical reports.  Id.  Although these reports failed to verify the ten-pound lifting restriction he described in his deposition, they generally corroborated his testimony.  Id.  The court held that "the fairly limited body of evidence" was sufficient to sustain his claims given the "less searching analysis of whether a plaintiff is substantially limited" required under the ADAAA.  Id. at *5; see also Canfield v. Movie Tavern, Inc., No. 13-CV-03484, 2013 WL 6506320, at *4-5 (E.D. Pa. Dec. 12, 2013) (finding plaintiff's allegations that he was medically "restrict[ed] from . . . bending, twisting, or lifting any weight over ten pounds" sufficient to survive the motion to dismiss stage); Gibbs v. ADS Alliance Data Sys., Inc., No. 10-2421-JWL, 2011 WL 3205779, at *3 (D. Kan. July 28, 2011) (denying summary judgment based upon record evidence demonstrating that plaintiff's carpal tunnel syndrome "affected her ability to perform manual tasks"); cf. Rocco, 998 F. Supp. 2d at 427 (granting summary judgment in light of the fact that plaintiff was neither taking prescription medication nor placed on lifting restrictions on the date of his termination).

Furthermore, the ADA is now applicable to some short-term impairments. See 29 CFR § 1630.2(j)(1)(ix).  The rules of construction state that "[t]he effects of an impairment lasting or expected to last fewer than six months can [now] be substantially limiting."  Id.  The rules further explain that "if an individual has a

back impairment that results in a 20-pound lifting restriction that lasts for several months, he is substantially limited in the major life activity of lifting, and therefore covered under the first prong of the definition of disability."  29 CFR § 1630 app.

Turning back to the present matter, Mission terminated Jacobs while she was on medical leave for carpal tunnel release surgery.  (Doc. 35 ¶ 78; Doc. 40 ¶ 78 at 31).  Jacobs relies primarily on two forms of evidence to establish that, at the time of her termination, her right hand impairment constituted a disability under the ADAAA: her own deposition testimony and medical records documenting the treatment of her hand.  Therein, she establishes that between July 2009 and January 2010, she attended at least fourteen physical therapy appointments, (Doc. 39-27 at 17-18 (Sept. 14, 2009 OSS discharge summary)), received prescription medication for "persistent pain, numbness, tingling[,] and . . . frequent nighttime awakening," (Doc. 39-11 at 13 (Dec. 16, 2009 medical assessment)), and was restricted from lifting more than ten pounds with her right hand, (Doc. 35 ¶¶ 30, 36; Doc. 40 ¶¶ 30, 36 at 20, 21).  She further demonstrates that, on the date her employment was terminated, she was on medical leave recovering from surgery. (Doc. 35 ¶ 74; Doc. 40 ¶ 74 at 30).  Only days prior, her surgeon had authorized her to return to work approximately two weeks later.  (Doc. 35 ¶ 74; Doc. 40 ¶ 74 at 30). Hence, Mission's contention that Jacobs's medical records fail to support her averments is plainly incorrect.  (Doc. 41 at 9).

The court need only satisfy itself that a genuine issue of material fact exists regarding whether Jacobs was substantially limited in a major life activity "as compared to most people in the general population" at the time of her termination.

29 C.F.R. § 1630.2(j)(1)(ii).  Lifting and performing manual tasks are both classified

as major life activities.  42 U.S.C. § 12102(2)(A).  The court finds that, construing the

evidence in the light most favorable to Jacobs, a reasonable factfinder could

conclude that Jacobs was substantially limited in these major life activities.  <u>See</u>

<u>also</u> § 4(a), 122 Stat. at 3555 ("The definition of disability . . . shall be construed in

favor of broad coverage of individuals . . . to the maximum extent permitted by the

terms of this Act.").  During the relevant time period, Jacobs was recovering from

carpal tunnel release surgery and was not yet approved to return to work.  In the

months leading up to her surgery, she received medical treatment regularly and

was restricted from lifting more than ten pounds with her right hand.  <u>Cf.</u> <u>Rocco</u>,

998 F. Supp. 2d at 427.  Uncontroverted record evidence supports these facts.  <u>See</u>

<u>Berkowitz</u>, 2014 WL 5461515, at *3-5.  Accordingly, the court holds that Jacobs has

adduced sufficient evidence of her disability to survive summary judgment.[4]

### 2.   *Direct Evidence*

Having demonstrated that her carpal tunnel syndrome could constitute a

disability under the ADAAA, Jacobs next contends that she has "set forth

persuasive direct evidence" that Mission terminated her employment "because of

---

[4] Because a reasonable juror could conclude that, at the time of her
termination, Jacobs had an actual disability within the meaning of the ADAAA, it is
unnecessary to address whether Mission "regarded [Jacobs] as" disabled under the
ADAAA.  42 U.S.C. § 12102(1).

[her] disability."[5]  (Doc. 39 at 10); 42 U.S.C. § 12112(a).  Mission rejects this

contention by focusing on Jacobs's migraines, alleging that no evidence exists "from

which a fact finder could reasonably conclude that the termination was related to

[her] migraine condition."  (Doc. 41 at 11).  Mission further avers that "[a]ll of

[Williams's] . . . alleged[ly] [discriminatory] comments . . . related to the right hand

condition and [had] nothing to do with the migraines."  (Id.)

It is well-settled that the quality of proffered evidence determines whether an

ADA claim is properly analyzed under the direct evidence "mixed motives" theory

or the McDonnell Douglas framework applicable to circumstantial evidence.  See

Price Waterhouse v. Hopkins, 490 U.S. 228, 275-77 (1989); McDonnell Douglas Corp.

---

[5] Mission does not contest whether Jacobs was "qualified" for the position of cashier and stocker at the economy store.  See Turner, 440 F.3d at 611 ("A 'qualified individual' is defined as one who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds.").  The court notes that "an employee who does not come to work on a regular basis is not 'qualified' " under the ADA, Smith v. Davis, 248 F.3d 249, 251 (3d Cir. 2001), because egregious patterns of absence are typically irremediable through reasonable accommodation.  See Blake v. UPMC Passavant Hosp., 394 Fed. App'x 940, 941 (3d Cir. 2010) (holding that an employee who frequently missed work due to a permanent disability was not "qualified" under the ADA); Santiago v. Temple Univ., 739 F. Supp. 974, 979 (E.D. Pa. 1990) ("[A]ttendance is necessarily the fundamental prerequisite to job qualification.").  The attendance requirements which govern this inquiry are contingent upon the particular job at issue.  See Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir. 1994); Munoz v. Nutrisystem, No. 13-4416, 2014 WL 3765498, at *5 (E.D. Pa. July 30, 2014) ("[V]iolation of an employer's attendance policy may constitute a legitimate and non-discriminatory basis for termination."); cf. Flory v. Pinnacle Health Hosp., No. 1:CV-06-1537, 2008 WL 2782664, at *3 (M.D. Pa. July 15, 2008) ("[Although] there is no categorical rule that makes an employee unqualified if she does not meet whatever attendance standard her employer establishes . . . . some level of regular attendance is necessary.").  In the matter sub judice, Mission neither claims that Jacobs failed to meet established attendance standards nor avers that the reasons asserted for her absence—her migraine condition and right hand impairment— could not be accommodated through reasonable measures.

v. Green, 411 U.S. 792, 802 (1973); Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 269 (3d Cir. 2010); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003); Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095-96 (3d Cir. 1995). Evidence of discrimination qualifies as direct when "it demonstrates that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512-13 (3d Cir. 1997) (quoting Price Waterhouse, 490 U.S. at 277). Specifically, the evidence must meet two requirements: it must be connected to the adverse employment action, and it must "be strong enough to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [employer's] decision." Anderson, 621 F.3d at 269 (quoting Walden, 126 F.3d at 515-16). In interpreting these standards, the Third Circuit has held repeatedly that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Armbruster v. Unisys Corp., 32 F.3d 768, 779 (3d Cir. 1994) (quoting Ezold v. Wolf, Block, Schorr and Solis–Cohen, 983 F.2d 509, 545 (3d Cir. 1992)), abrogated on other grounds by Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 235-36 (3d Cir. 1999); see, e.g., Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002). If the plaintiff produces direct evidence, the burden of production shifts to the employer at trial. See Anderson, 621 F.3d at 269; Walden, 126 F.3d at 512-13. The employer must then show that it would have taken the adverse action even in the absence of a discriminatory motive. See Anderson, 621 F.3d at 269; Walden, 126 F.3d at 512-13.

In the instant case, Jacobs alleges that Williams made numerous discriminatory comments regarding her carpal tunnel syndrome in the months preceding Mission's termination of her employment.  (Doc. 39 at 10).  The Rule 56 record corroborates this assertion.  (Doc. 39 ¶¶ 50-51; Doc. 40 ¶¶ 50-51 at 24).  In its statement of material facts, Mission concedes, "It is only Darrell Williams that made comments about [Jacobs's] condition, not Tim Miller or others."  (Doc. 35 ¶ 50). Mission cites to Jacobs's deposition in support of this statement, wherein Jacobs explained that Williams made "comments about [her] disability."  (Jacobs Dep. 96:18-97:4).  At other points in her deposition, Jacobs explained that Williams's "comments about [her] disability" constituted weekly harassment: namely, persistent questioning regarding her need to attend physical therapy.  (Id. at 70:4-71:13) ("[I]s it really important?  Do you really have to leave?  And do you really need therapy?").  Williams also apparently expressed unmistakable irritation whenever Jacobs requested time off for appointments.  (Id. at 77:17-78:7).  This behavior allegedly continued through Jacobs's last request in January 2010, when she sought permission to take a medical leave of absence.  (Id.)

Furthermore, in its statement of material facts, Mission asserts the following:

> Darrell Williams ostensibly told [Jacobs] 2 times in September 2009 that she was "jeopardizing [her] job because [she] was taking too much time off.["] . . . She needed to take off these 2 times to go to the orthopedic doctor at Orthopedic and Spine Specialists (OSS). . . . Though Mr. Williams was "irritated" [Jacobs] was allowed to take off and did take off and go to OSS. . . . Mr. Williams did not say she was jeopardizing her job other than these 2 times in September 2009.

(Doc. 35 ¶ 51).  Mission cites once again to Jacobs's deposition in support of this statement.  (Id.)  Therein, she testified that twice in September 2009, Williams warned that she was "jeopardizing her job by taking off."  (Jacobs Dep. 122:6-123:19).  On both occasions, Williams was allegedly responding to Jacobs's requests to miss work for physical therapy appointments.  (Id.)  This issue arose in Jacobs's deposition when she was asked why she requested to "return to full duties at work" during an orthopedic therapy appointment in September 2009.  (Id. at 121:34-122:10).  Jacobs explained that she made the request because she was motivated by the desire to avoid further comments from Williams.  (Id. at 122:6-122:10).

The Third Circuit has explained that "statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit . . . even if . . . not made at the same time as the adverse employment decision" are sufficient to shift the burden of proof to the employer.  Fakete, 308 F.3d at 339 ("[T]he adjective 'direct' is imprecise because 'certain circumstantial evidence is sufficient . . . if that evidence can fairly be said to directly reflect the alleged unlawful basis for the adverse employment decision.' " (quoting Walden, 126 F.3d at 513)).  In Fakete v. Aetna, the Third Circuit held that a supervisor's remark that he was "looking for younger single people" and that the plaintiff employee "wouldn't be happy [at Aetna] in the future" constituted direct evidence of discriminatory intent.  308 F.3d at 339.  The offending supervisor was highly involved in Aetna's decision to terminate the plaintiff's employment months later.  Id.  Of particular import to the Third Circuit was the content of the

24

supervisor's statement; significantly, a manager who later played a central role in electing to terminate the plaintiff had not only expressed a discriminatory view of the plaintiff's protected trait, but also directly associated his view of that protected trait with the plaintiff's job security. See id. The court held that "a reasonable jury could find that [the supervisor's] statement was a clear, direct warning to [the plaintiff] that he was too old . . . and that he would be fired soon if he did not leave Aetna on his own initiative." Id.

In the instant matter, the undisputed record reveals that Williams made numerous negative comments to Jacobs regarding her right hand impairment. (Doc. 39 ¶¶ 50-51; Doc. 40 ¶¶ 50-51 at 24). On at least two occasions, Williams's disparaging remarks created a direct link between his discriminatory attitude and Jacobs's prospects for continued employment with Mission. Namely, Williams twice warned that Jacobs was "jeopardizing her job by taking off," stated directly in response to her requests for permission to miss work for physical therapy appointments. (Jacobs Dep. 122:6-123:19). Approximately six months later, while Jacobs was out on medical leave for carpal tunnel release surgery, Williams and Gorog made the decision to terminate her employment. (Doc. 35 ¶ 78; Doc. 40 ¶ 78 at 31). As in Fakete, although Williams's most invidious comments were made months before Jacobs was discharged, their relevance to Mission's decision is clear. 308 F.3d at 339. Additionally, like the supervisor in Fakete, Williams played a central role in the decisional process that led to Jacobs's termination. Id. Gorog, the Executive Director, admitted to having very limited interaction with the economy store staff. (Doc. 40 ¶ 30 at 3; Gorog Dep. 26:15-27:2). Consequently,

Williams and Miller were principally responsible for evaluating the store employees, including Jacobs.  (Doc. 40 ¶ 154 at 13; Williams Dep. 22:12-23:15).  When Williams and Gorog met to determine which employees to terminate, they relied heavily on these evaluations.  (Williams Dep. 91:16-92:8).  Clearly, Jacobs's proffered evidence of discrimination is directly connected to her termination; Williams's comments indicate that he may have planned to take adverse employment action against Jacobs based upon her disability.  See Anderson, 621 F.3d at 269.  Viewed in the light most favorable to Jacobs, this evidence is "strong enough to permit [a] factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in [Mission's adverse employment] decision."  Anderson, 621 F.3d at 269; see Fakete, 308 F.3d at 339.  Therefore, the court concludes that Jacobs has demonstrated through direct evidence that Mission "placed substantial negative reliance" on her disability in reaching its decision.[6]  Walden, 126 F.3d at 512-13 (quoting Price Waterhouse, 490 U.S. at 277).

Jacobs has presented sufficient evidence to show that (1) she had a disability; (2) she was qualified to perform her job, with or without reasonable accommodation; and (3) she was terminated because of that disability.  See Turner, 440 F.3d at 611.  Accordingly, the court will deny Mission's motion for summary judgment as to Jacobs's ADA discrimination claim.

---

[6] Jacobs also argues that she has set forth sufficient circumstantial evidence to survive summary judgment.  (Doc. 39 at 10-12).  However, because Jacobs has proffered direct evidence of disability discrimination, it is unnecessary to undertake the McDonnell-Douglas analysis applicable to circumstantial evidence.  See Anderson, 621 F.3d at 269 (stating that once direct evidence is introduced, "it is unnecessary to rely on the [McDonnell-Douglas] burden-shifting framework" (quoting Walden, 126 F.3d at 512)).

### B.    PHRA Discrimination Claim

Prior to the 2008 amendments to the ADA, claims brought under the ADA and the PHRA were analyzed coextensively.  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Syed v. YWCA of Hanover, 906 F. Supp. 2d 345, 354 (M.D. Pa. 2012). However, Pennsylvania has *not* amended the terms of the PHRA to parallel the ADAAA's extended coverage.  Rocco, 998 F. Supp. 2d at 428; e.g., Fischer v. Joseph McCormick Constr. Co., No. CIV.A.1:13-44, 2014 WL 5528693, at *7 (W.D. Pa. Nov. 3, 2014) ("[T]he category of 'disabled' individuals protected under the PHRA may be smaller than the category of 'disabled' individuals protected under the [ADAAA].").  Accordingly, Jacobs's PHRA claim requires separate analysis.

To set forth a claim for disability discrimination under the PHRA, Jacobs must first establish that she had a disability within the meaning of the pre-amended ADA.  See Turner, 440 F.3d at 611.  As discussed *supra*, Jacobs asserts that she was actually disabled by virtue of her chronic migraines and carpal tunnel syndrome. (Doc. 39 at 18-19).  Alternatively, Jacobs contends that "she can . . . prove that [Mission] perceived her as being disabled."  (Doc. 39 at 22); see 42 U.S.C. § 12102(1)(C).  Mission argues that Jacobs's claim must be dismissed "under the PHRA['s] . . . . higher bar."  (Doc. 41 at 16).  For the reasons set forth herein, the

court agrees that Jacobs has failed to present a genuine issue as to whether she was actually disabled or "regarded as" disabled under the PHRA.[7]

### 1.   *Actual Disability*

Under the PHRA, a plaintiff is substantially limited in a major life activity if their "impairment . . . prevents or severely restricts [them] from doing activities that are of central importance to most people's daily lives." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002).  To determine whether an individual meets this threshold, the pre-ADAAA rules of construction set forth the following factors:

> (i)      The nature and severity of the impairment;
>
> (ii)     The duration or expected duration of the impairment; and
>
> (iii)    The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

Emory v. AstraZeneca Pharm. LP, 401 F.3d 174, 180 (3d Cir. 2005) (quoting 29 C.F.R. § 1630.2(j)(2) (2010)).

Applying these standards, the Supreme Court held in 2002 that a plaintiff with carpal tunnel syndrome was not disabled within the meaning of the ADA. Toyota, 534 U.S. 184.  The Court noted that the "large potential differences in the

---

[7] The court is cognizant of the apparent tension between this result and the survival of Jacobs's ADA claim.  However, assuming *arguendo* that Mission regarded Jacobs as substantially limited "as compared to most people in the general population," 29 C.F.R. § 1630.2(j)(1)(ii)—the lower threshold for establishing a disability under the ADAAA—the PHRA standard would not be met; thus, Jacobs's PHRA "regarded as" claim would still fail.  The court recognizes that the ever evolving landscape of disability discrimination law occasionally necessitates such outcomes.  See, e.g., Riley v. St. Mary Med. Ctr., No. 13-CV-7205, 2014 WL 2207347, at *3-5 (E.D. Pa. May 28, 2014) (finding plaintiff's evidence sufficient to establish that she was actually disabled under the ADA, but insufficient to show that she was either actually disabled or "regarded as" disabled under the PHRA).

severity and duration of the effects of carpal tunnel syndrome" require individualized analysis. Id. at 199.  Although the plaintiff therein was unable to perform repetitive manual tasks, she retained the capacity to tend to personal hygiene and carry out household chores. Id. at 201-02.  Hence, her impairment did not constitute a disability. Id.  Additionally, as noted *supra*, the Third Circuit previously held that neither non-chronic, short-term conditions nor impairments resulting in ten-pound lifting restrictions qualify as "substantially limiting" under the ADA. See Macfarlan, 675 F.3d at 274-75; Marinelli, 216 F.3d at 364.

In the matter *sub judice*, Jacobs asserts that her carpal tunnel syndrome substantially limited her ability to perform major life activities.[8]  Jacobs does not, however, establish that her impairment was severe or that it would have had a long-term impact on her ability to perform "activities that are of central importance to most people's daily lives." Toyota, 534 U.S. at 198; see Macfarlan, 675 F.3d at 274-75; Emory, 401 F.3d at 180.  Furthermore, the evidence of record does not indicate that Jacobs was incapable of tending to personal hygiene or carrying out household chores, even while recovering from surgery. See Toyota, 534 U.S. at 199. Like the plaintiff in Marinelli, Jacobs's inability to lift more than ten pounds for a temporary period did not render her "sufficiently different from the general population . . . [to qualify as] substantially limited in [her] ability to lift." 216 F.3d

---

[8] Jacobs's migraine condition indisputably falls short of qualifying as a disability under the PHRA.  As discussed *supra*, this condition fails to satisfy the more inclusive standard under the ADAAA.  Thus, the court will only consider Jacobs's carpal tunnel syndrome with respect to her PHRA discrimination claim.

at 364.  Accordingly, the court concludes that Jacobs does not present a genuine issue regarding whether she was actually disabled under the PHRA.

###### 2.    *Regarded as Disabled*

To successfully assert a "regarded as" disability claim under the pre-ADAAA standard, a plaintiff must show that, at the time of the adverse employment action, their employer "mistakenly believed that [they had an] . . . impairment that substantially limit[ed] one or more major life activities or mistakenly believed that an actual non-limiting impairment substantially limit[ed] one or more major life activities."  Wilson v. MVM, Inc., 475 F.3d 166, 179 (3d Cir. 2007) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)).  To accomplish this, a plaintiff must demonstrate that their employer perceived them as "suffering from an impairment *within the meaning of the [PHRA]*, not just . . . somehow disabled."  Rinehimer, 292 F.3d at 381 (emphasis added).  This inquiry focuses on the "reactions and perceptions" of the employer.  Kelly, 94 F.3d at 108-09; see, e.g., Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 188 (3d Cir. 1999) ("In general, an employer's perception that an employee cannot perform a wide range of jobs suffices to make out a 'regarded as' claim.").

Turning to the matter before the court, Jacobs attempts to create a genuine issue as to whether Mission believed that her migraine condition or right hand impairment severely limited her from performing at least one activity central to her daily life.  See Toyota, 534 U.S. at 198; Wilson, 475 F.3d at 179.  In support of her claim, Jacobs avers that Mission "believed she was incapable of performing her job duties because of her medical conditions and time off for treatment of the

conditions." (Doc. 39 at 22).  The record belies this averment.  In fact, Mission expressed great skepticism regarding the severity of Jacobs's right hand impairment.  On multiple occasions, Williams overtly questioned whether Jacobs actually needed to attend scheduled physical therapy sessions and doctor's appointments.  (Doc. 39 at 10; Jacobs Dep. 67:19-68:6; 69:15-70:23; 72:13-72:18).  Furthermore, Jacobs testified that after her car accident, Williams refused to guarantee her assistance with lifting items greater than ten pounds during her scheduled work hours.  (Doc. 39 at 10; Jacobs Dep. 83:15-83:24).  He also told her "not to baby [her] right hand because no one [was] going to help [her]."  (Jacobs Dep. 92:8-92:23).

Similarly, Mission did not appear to regard Jacobs as substantially limited due to her migraine condition.  The evidence of record indicates that Mission granted all of Jacobs's requests for time off, including those prompted by migraines.  (Doc. 35 ¶ 53; Doc. 40 ¶ 53 at 25).  In 2006, Gorog was aware of Jacobs's condition when he approved her transition from part-time employment to full-time employment.  (Doc. 35 ¶ 2; Doc. 40 ¶ 2 at 19).  By Jacobs's account, Gorog merely instructed her to "call in when she was unable to come in to work because of her migraines."  (Doc. 35 ¶ 13; Doc. 40 ¶ 13 at 20).  Contrary to Jacobs's assertion, the foregoing facts indicate that Mission believed that she *was* capable of performing the duties of a full-time cashier and stocker at the economy store.

Although Mission was aware of Jacobs's migraine condition and right hand impairment, there is no evidence that Mission regarded her as "severely restrict[ed] from doing activities that are of central importance to most people's daily lives."

31

Toyota, 534 U.S. at 198.  For these reasons, Mission is entitled to summary

judgment with respect to Jacobs's PHRA disability discrimination claim.

### C.     Retaliation Claims[9]

Jacobs alleges that she has established through "overwhelming direct

evidence"[10] that Mission retaliated against her for "request[ing] time off from work

to obtain medical treatment."[11]  (Doc. 39 at 33).  In response, Mission contends that

Jacobs fails to demonstrate a "nexus between [her] termination and . . . any leave

request."  (Doc. 34 at 30).  For the reasons that follow, Jacobs's retaliation claim

survives summary judgment.

---

[9] ADA retaliation claims and PHRA retaliation claims are properly analyzed under the same legal standard.  See Krouse v. Am. Sterilizer, Co., 126 F.3d 494, 498 (3d Cir. 1997) ("[A] person's status as a 'qualified individual with a disability' is not relevant in assessing the person's claim for retaliation under the ADA."); see also Baker v. United Def. Indus., 403 Fed. App'x 751, 754 n.4 (3d Cir. 2010) (citing Kelly, 94 F.3d at 105); Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002).  Hence, this discussion of Jacobs's ADA retaliation claim applies equally to Jacobs's PHRA retaliation claim.

[10] As with Jacobs's discrimination claim, Jacobs additionally argues that she has set forth sufficient circumstantial evidence to survive summary judgment.  (Doc. 39 at 29-36).  However, because the court finds that Jacobs has proffered direct evidence of retaliation, it is unnecessary to consider the evidence under the McDonnell-Douglas theory.  See Anderson, 621 F.3d at 269 (stating that once direct evidence is introduced, "it is unnecessary to rely on the [McDonnell-Douglas] burden-shifting framework" (quoting Walden, 126 F.3d at 512)).

[11] Jacobs also asserts that Mission retaliated against her for opposing Williams's discriminatory comments.  (Doc. 39 at 33).  Specifically, she avers that she complained to Williams, Miller, and Siple regarding his remarks.  (Doc. 40 ¶ 60 at 28; Jacobs Dep. 75:2-75:7; 76:8-76:16; 77:2-77:13; 78:8-78:12; 100:4-100:22).  Mission contends that Jacobs complained to Williams only.  (Doc. 35 ¶ 60; Jacobs Dep. 100:4-100:22).  Jacobs makes no particularized assertions in support of her argument and provides no evidence that Mission retaliated against her on this basis.  Because Jacobs successfully establishes her retaliation claim on other grounds, the court will not address this argument further.

"Prohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation."  Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010) (citing Williams, 380 F.3d at 759 n.2).  A medical leave of absence may constitute such a reasonable accommodation.  29 C.F.R. § 1630 app.; Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 151 (3d Cir. 2004) (A medical leave of absence "enable[s] the employee to perform his essential job functions in the near future.").  In the instant case, Jacobs alleges that she engaged in protected activity by requesting permission to take a medical leave of absence, in order to have carpal tunnel release surgery performed on her right hand.  (Doc. 39 at 33).

As previously discussed in greater detail, to proceed under a direct evidence theory, a plaintiff must demonstrate that "the [employer's] unlawful motive was a 'substantial motivating factor' in the adverse employment action."  Shellenberger, 318 F.3d at 187 (quoting Watson v. Southeastern Pa. Transp. Auth., 207 F.3d 207, 215 (3d Cir. 2000)).  When a plaintiff proffers "statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus[,] . . . that plaintiff is entitled to a [direct evidence] burden-shifting instruction."  Starceski, 54 F.3d at 1097 (quoting Hook v. Ernst & Young, 28 F.3d 366, 375 (3d Cir. 1994)).

The court's factual analysis of Jacobs's ADA discrimination claim, undertaken supra, is equally applicable herein.  In short, between July 2009 and January 2010, Williams made multiple adverse remarks to Jacobs regarding her right hand impairment.  (Doc. 39 at 10).  Significantly, Williams warned Jacobs twice that she was "jeopardizing her job by taking off" for physical therapy

appointments.  (Jacobs Dep. 122:6-123:19).  Approximately six months later, acting

on behalf of Mission, Williams and Gorog terminated Jacobs's employment while

she was out on approved medical leave for surgery.  (Doc. 35 ¶ 78; Doc. 40 ¶ 78 at

31).  On these uncontested facts, the connection between Williams's comments and

Mission's allegedly retaliatory motive for terminating Jacobs is evident.  See

Anderson, 621 F.3d at 269; Fakete, 308 F.3d at 339.  Viewed favorably to Jacobs,

Williams's comments show that he intended to take adverse employment action

against Jacobs if she continued to request time off for medical treatments related to

her right hand impairment.  As with Jacobs's ADA discrimination claim, the court

concludes that Jacobs has produced evidence "strong enough to permit [a]

factfinder to infer that a [retaliatory] attitude was more likely than not a motivating

factor in [Mission's] decision."  Anderson, 621 F.3d at 269 (quoting Walden, 126 F.3d

at 515-16).  Consequently, summary judgment will be denied as to Jacobs's ADA

and PHRA retaliation claims.

## IV.    Conclusion

        For all of the foregoing reasons, Mission's motion (Doc. 33) for summary

judgment will be granted in part and denied in part.  An appropriate order will

issue.

                                        /S/ CHRISTOPHER C. CONNER
                                        Christopher C. Conner, Chief Judge
                                        United States District Court
                                        Middle District of Pennsylvania


Dated:        December 10, 2014